ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 0 4 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| LOCKHEED MARTIN CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action File No. **1:05-CV-0902** |
| ) | |
| L-3 COMMUNICATIONS ) | |
| CORPORATION and L-3 ) | **CAP** |
| COMMUNICATIONS INTEGRATED ) | |
| SYSTEMS, LP, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR MISAPPROPRIATION AND MISUSE OF TRADE SECRETS AND BREACH OF LICENSE AGREEMENTS

COMES NOW Plaintiff, Lockheed Martin Corporation ("Lockheed Martin"), through the undersigned Counsel, and for its Complaint against Defendants, L-3 Communications Corporation and L-3 Communications Integrated Systems, LP (collectively, "L-3 Comm"), avers as follows:

Lockheed Martin respectfully requests that this Court enter a permanent injunction to enjoin L-3 Comm's ongoing and impending use and disclosure of

FORMS RECEIVED
Counsel to file Mag
Pretrial Limitations
IDv VILNG

Lockheed Martin's proprietary data and trade secrets. Lockheed Martin further seeks compensatory damages and additional relief to remedy L-3 Comm's ongoing unlicensed use of Lockheed Martin proprietary data and trade secrets.

## The Parties

1. Lockheed Martin Corporation is a Maryland corporation with its principal place of business in Bethesda, Maryland ("Lockheed Martin"). Lockheed Martin Aeronautics – Marietta, which is located in the Northern District of Georgia (in Marietta, Georgia), is a Division of Lockheed Martin's Aeronautics Sector, and is not separately incorporated. Lockheed Martin Aeronautics – Marietta is the custodian of the Lockheed Martin proprietary data and trade secrets that are the subject of this action.

2. L-3 Communications Corporation is a Delaware corporation with its principal place of business in New York, New York, and L-3 Communications Integrated Systems, LP (collectively, "L-3 Comm") is a limited partnership organized under the laws of Delaware with its principal place of business in Greenville, Texas. L-3 Comm is subject to personal jurisdiction in Georgia. L-3 Comm has substantial contacts with the State of Georgia and regularly conducts business activity in Georgia. L-3 Communications Corporation maintains offices in Georgia, including the offices of a subsidiary, L-3 Communications Display

2

Systems (located in Alpharetta, Georgia).   Furthermore, L-3 Communications Corporation maintains a registered agent in the Northern District of Georgia:  CT Corporation System, 1201 Peachtree Street, Atlanta, Fulton County, Georgia 30361.

### Jurisdiction and Venue

3. Subject matter jurisdiction in this action is proper under 28 U.S.C. § 1332. The amount in controversy, including the value of the Lockheed Martin proprietary data and trade secrets misappropriated or otherwise misused by L-3 Comm, exceeds $75,000.

4. Venue in this action is proper in the Northern District of Georgia under 28 U.S.C. § 1391(a) because, among other reasons, (1) the original Lockheed Martin proprietary data and trade secrets at issue are located in Marietta, Georgia; (2) the September 1993 license between Lockheed Martin and the United States Navy that is central to this dispute (and which is described in detail below) was negotiated and executed by Lockheed Martin Aeronautics – Marietta in Marietta, Georgia; and (3) the P-3 aircraft now owned and operated by the Republic of Korea – the same aircraft for which L-3 desires to use Lockheed Martin's proprietary data and trade secrets to perform modification and upgrade work – were built by Lockheed Martin Aeronautics.

**Summary of Lockheed Martin's Causes of Action**

5. In this action, Lockheed Martin seeks relief with respect to L-3 Comm's misappropriation and misuse of trade secrets and breach of license agreements between the parties for certain uses of Lockheed Martin proprietary data for the P-3 aircraft ("P-3 Data"). Lockheed Martin also seeks damages and attorneys' fees to compensate Lockheed Martin for L-3 Comm's past violations of trade secret law and contractual breaches.

6. L-3 Comm is presently in the process of finalizing, as a subcontractor to Korean Aerospace Industries, Ltd. ("KAI"), a contract with the Republic of Korea ("ROK") Navy for the modification and upgrade of P-3 aircraft owned and operated by the ROK. The work under the ROK contract involves structural modifications to the P-3 that, on information and belief, cannot be properly, safely, and commercially completed without use of Lockheed Martin's P-3 Data. The work under the ROK contract also involves upgrades and modifications to the P-3 avionics and mission systems which, on information and belief, cannot be performed without proprietary P-3 Data. L-3 Comm has advised Lockheed Martin that KAI and L-3 Comm have finalized the terms and conditions of the ROK contract and that the contract is pending final approval by the Korean government, which is expected in the immediate future.

7. To Lockheed Martin's knowledge, there are only two sources whereby L-3 Comm could have acquired the P-3 Data. Neither of these sources permit L-3 Comm to use or disclose the proprietary P-3 Data which is required to perform the ROK contract. The first source of the P-3 Data is a license granted by Lockheed Martin in September 1993 to the United States Government for "Greater Rights" in and to the P-3 Data. This license was granted by Lockheed Martin to the U.S. Government in the course of settling a dispute concerning the Government's termination of the contract to build the P-7 aircraft, which was to have been the replacement aircraft for the P-3 ("P-7 Settlement License"). Under this license, Lockheed Martin granted the United States the right to use certain P-3 Data and to disclose P-3 Data to third parties, including L-3 Comm, only in the course of specified types of United States government contracts to upgrade or modify P-3 aircraft owned and operated by the United States. This license expressly excluded work on any aircraft owned or operated by foreign governments, such as the ROK.

8. The second source of P-3 Data is a license that Lockheed Martin granted to L-3 Comm (then known as Raytheon E-Systems) in September, 1997. Under this license, Lockheed Martin granted L-3 Comm a license to use P-3 Data only to perform modifications and upgrades to certain specified avionics and mission systems on the P-3. This "Avionics and Mission Systems License" does not

permit further disclosure of the data beyond the extent necessary for L-3 to perform this specified work. The license is strictly limited, only permitting L-3 to offer and sell to any third party only the avionics and mission systems upgrades specified in the license, and for no other purposes. This license does not permit L-3 Comm to grant or sublicense P-3 Data to either KAI or the ROK as is typically required under such foreign government contracts. This license does not permit L-3 Comm to use and disclose Lockheed Martin proprietary information to third parties, such as KAI and the ROK, in order for such parties to perform work themselves on the specified systems. In the event L-3 Comm shares P-3 Data with third parties in order for L-3 Comm itself to perform such work, this license requires such third parties to execute a nondisclosure agreement that prohibits further disclosure of P-3 Data and that requires all P-3 Data to be returned within 30 days of completion of such work.

9. Throughout the history of the P-3 aircraft, Lockheed Martin has aggressively safeguarded its P-3 Data from improper, unlawful, or inadvertent disclosure to third parties. The P-3 Data that is the subject of this dispute included the proprietary data covered by the two licenses discussed above and is not in the public domain.

10. Lockheed Martin has attempted, unsuccessfully, to resolve this dispute with L-3 Comm.  Lockheed Martin has specifically asked L-3 Comm to provide the information and documents that establish L-3 Comm's legitimate right to use P-3 Data.  To date, L-3 Comm has not provided such information, despite L-3 Comm's repeated assertions that such documents exist.  Moreover, in the parties' pre-suit discussions, L-3 Comm has disclosed no source of P-3 Data other than the two licenses mentioned above.

11. This action is necessary in order to prevent (a) L-3 Comm's continued unlawful appropriation and use of P-3 Data, and (b) irreparable harm to Lockheed Martin's competitive interest in the P-3 Data.

### Lockheed Martin's Electra and P-3 Aircraft Data

12. Lockheed Martin and its predecessors (including Lockheed Aircraft Corporation) are the original manufacturers of the P-3 series aircraft.  For more than 40 years, the P-3 has served as the primary Anti-Submarine Warfare ("ASW") aircraft for the United States Navy, as well as for the armed forces of numerous foreign countries.  The P-3 was developed from the L-188 Electra, a civilian airliner that Lockheed Martin developed and manufactured starting in the 1950's.

13. The  P-3 Data is essential to performing any significant modification or upgrade work involving structural components or wing components on the P-3.

This data was developed during the 1950's and 1960's for the L-188 Electra civilian airliner. The P-3 Data is contained in, among other sources, Lockheed Martin's Stress Memorandum Manual and Design Handbook for the Electra and P-3. The Stress Memorandum Manual and Design Handbook, as well as various engineering reports and other documents that contain portions of the Manual and Handbook, contain the structural information necessary to perform any significant modifications on the Electra and P-3 airframes. These documents bear Lockheed Martin's customary commercial restrictive legend that was used at the time to designate information that Lockheed Martin considered to be proprietary in nature.

14. Under the Department of Defense procurement regulations that came into effect beginning in the 1960's, there were two broad categories of license rights in technical data received by the United States Government: (1) "limited rights" and (2) "unlimited rights." Two other categories of rights, "restricted rights" (which apply only to software) and "government purpose rights," were subsequently added to the regulations.

15. The Government normally receives only a "limited rights" license in technical data, or "restricted rights" in software, that was developed at private expense. Under such a "limited rights" or "restricted rights" license, the Government, with some narrow exceptions that are not applicable here, may only

use such data within the Government and may not, without the written permission of the party possessing limited or restricted rights, release the technical data or software outside of the Government or authorize its use by other parties. In contrast, the Government normally obtains an "unlimited rights" license with respect to data developed at Government expense, which permits the Government to use and disclose such data for any purpose whatsoever, including authorizing third parties to use it for any purpose whatsoever.

16. Where data is developed with a combination of private and Government funding, the Government typically receives a "Government Purpose" license, which permits the Government to use the data only for future United States Government purposes, including disclosing the data to other contractors as necessary to perform work under other United States Government contracts.

17. Beginning in 1959, Lockheed Martin began to perform contracts for the United States Navy to manufacture the military version of the Electra that became known as the P-3. Through the course of the P-3 program, there was a great deal of controversy between Lockheed Martin and the Navy with respect to the parties' respective rights in the technical data relating to the aircraft, due to the commercial genesis of the original airframe and private funding of the Electra technical data.

18. With respect to P-3 technical data, Lockheed Martin's position was, in broad terms, that the United States Government had no license to use structural data developed by Lockheed Martin at private expense in the course of its design and manufacture of the Electra civilian airliner, including P-3 structural data that was only slightly modified from Electra data in order to comport with form or fit changes necessary for the P-3.

19. Lockheed Martin's Stress Memorandum Manual and Design Handbook were marked, on their covers, with a restrictive legend, consistent with Lockheed Martin's commercial practices. For example, the Stress Memorandum Manual is plainly marked on the cover as follows:

> THIS MATERIAL CONTAINS PROPRIETARY INFORMATION OF LOCKHEED AERONAUTICAL SYSTEMS COMPANY. DISCLOSURE TO OTHERS, USE OR COPYING WITHOUT EXPRESS WRITTEN AUTHORIZATION OF LOCKHEED AERONAUTICAL SYSTEMS COMPANY IS STRICTLY PROHIBITED.

20. Lockheed Martin's other P-3 documents (such as stress, fatigue, and engineering reports) that contain portions of the Stress Memorandum Manual and Design Handbook, were marked with a restrictive legend then used by Lockheed Martin. For example, Lockheed Martin routinely marked its engineering reports relating to the Electra/P-3 with a commercial restrictive legend that stated:

THE INFORMATION DISCLOSED HEREIN WAS ORIGINATED BY AND IS THE PROPERTY OF THE LOCKHEED AIRCRAFT CORPORATION, AND EXCEPT FOR USES EXPRESSLY GRANTED TO THE UNITED STATES GOVERNMENT, LOCKHEED RESERVES ALL PATENT, PROPRIETARY DESIGN, USE, SALE, MANUFACTURE AND REPRODUCTION RIGHTS THERETO.  INFORMATION CONTAINED IN THIS REPORT MUST NOT BE USED FOR SALES PROMOTION OR ADVERTISING PURPOSES.

Moreover, the various pages within Lockheed Martin's engineering reports plainly stated that the Reports contained portions of Lockheed Martin's Stress Memorandum Manual, as these portions were denoted by the reference "S.M." *See, e.g.,* Lockheed Martin P-3 Engineering Report No. 13663, Feb. 13, 1961; Report No. 13664, Feb. 14, 1961; Report No. 13669-I, Dec. 19, 1960; Report No. 13670, Feb. 14, 1961; and, Report No. 14840, Jan 31, 1961.

21.  Throughout the history of the P-3 program, the Navy was familiar with and understood Lockheed Martin's practices and positions with respect to the identification and marking of, and the protection Lockheed Martin expected to be accorded to, the P-3 Data.

22.  The dispute between Lockheed Martin and the Navy with respect to the U.S. Government's interest and proper uses of the P-3 Data remained unresolved until 1993.

### The "P-7 Settlement License" Granted by Lockheed Martin
### to the U.S. Government

23.  In 1993, Lockheed Martin and the Navy had the opportunity to resolve this controversy, and to resolve the parties' rights with respect to the P-3 Data, in the course of resolving a separate dispute between Lockheed Martin and the Navy that arose from the Navy's termination of the P-7 aircraft program.  The P-7 was intended to be a replacement aircraft for the P-3, but the Navy decided to terminate the P-7 program in 1989.

24.  Under the terms of the Settlement Agreement that resolved the P-7 dispute, Lockheed Martin granted the U.S. Government a license which provided it "Greater Rights" in certain P-3 Data.  This license was executed as a Delivery Order under an existing contract between Lockheed Martin and the Navy for other P-3 aircraft work.  See Exhibit A hereto (September 29, 1993 Delivery Order 0007 to Contract No. N00019-92-G-0089), which is incorporated herein by reference ("the P-7 Settlement License").  This license prohibited the Navy from providing to third parties such as L-3 Comm for non-United States government work P-3 "Greater Rights" Data involving the Stress Memorandum Manual, Design Handbook, or documents containing portions thereof, all of which was marked with a restrictive rights legend.

12

25. The United States intended the P-7 Settlement License to resolve the controversy with respect to P-3 Data rights that existed between Lockheed Martin and the Navy, including rights to data contained in Lockheed Martin's Stress Memorandum Manual and Design Handbook. Without this data, no significant upgrade, service life extension or modification work to the P-3 aircraft is possible. As more fully described below, the P-7 Settlement License essentially granted the United States a license to use Lockheed Martin's P-3 structural and design data that had been developed at private expense (or modified only slightly from data developed at private expense) only for specified United States governmental purposes.

26. The P-7 Settlement License provided that (a) the commercial restrictive legends that Lockheed Martin had placed on its Stress Memorandum Manual, as well as on its engineering reports (which contained portions of the Stress Memorandum Manual), would be accorded the same treatment as the restrictive legends provided for under defense procurement regulations; (b) the U.S. Government would receive "Greater Rights" in Lockheed Martin P-3 Data that contained Lockheed Martin restrictive legends (either a legend used by Lockheed Martin in its commercial endeavors or a legend provided for under defense procurement regulations); and (c) the U.S. Government would receive "unlimited

rights" only in data that did not bear a restrictive legend. Lockheed Martin's legends put the Government and any other recipient of these documents on express notice of Lockheed Martin's continuing rights and interest in the Electra and P-3 structural data and, as discussed in detail below, qualifies these items as "Greater Rights" P-3 Data subject to the restrictions contained in the P-7 Settlement License.

27. The P-7 Settlement License recognized the nature of Lockheed Martin's continuing proprietary interest in the data that was the subject of the license. Lockheed Martin and the Government acknowledged that this data was developed by Lockheed Martin in the commercial setting. Accordingly, the P-7 Settlement License contains several definitions that recognize Lockheed Martin's proprietary interest in the data:

I. Definitions

   In resolving their disagreements, the Navy and Lockheed hereby agree that in addition to the words and/or terms used herein and defined in DFARS [Department of Defense Federal Acquisition Supplement] 252.227-7013(a) (OCT 1988), the following definitions shall apply:

   1. *"Greater Rights"* shall mean, in addition to limited rights, the grant by Lockheed to the Government as set forth in this [license agreement].

> 2. "Licensed Data or *"Greater Rights Data"* shall mean the data to which the License applies as set forth in this [license agreement].
>
> * * *
>
> 5. *"Restrictive Rights Legend"* shall mean a limited rights, restricted rights, or other marking authorized by a defense procurement regulation, *or a commercial legend with respect to Lockheed's Stress Memorandum Manual or Design Handbook or portions thereof*, indicating Lockheed proprietary rights in the marked document.

P-7 Settlement License, Section I (emphasis added).

28. To Lockheed Martin's knowledge, all proprietary P-3 Data contained in the drawings, reports, specifications, and other P-3 documents that it provided to the Navy includes or is based upon technical data contained in either the Stress Memorandum Manual or the Design Handbook, and includes a restrictive rights legend.

29. The P-7 Settlement License contained the following stipulations that specified the various categories of P-3 Data subject to the license, and the nature of the Government's interest in each of these categories of data:

> 1. Any P-3 Data in the government's Possession *which fails to include a Restrictive Rights Legend* shall be deemed to be unlimited rights data.
>
> * * *

3. To the extent provided herein, the provisions of this [license] take precedence over and supercede any limitations of any Restrictive Rights Legend(s) set forth on the P-3 Data.

4. Except to the extent that this [license] grants Greater Rights to the government, this [license] shall have no impact, force, or effect of law on the enforcement of any existing rights by either party in the P-3 Data. Nothing in this [license] shall restrict any Lockheed right to reproduce, use, license and disclose to others any P-3 Data.

P-7 Settlement License, Section II (emphasis added).

30. Lockheed Martin's and the Government's mutual intent, as reflected in the foregoing stipulations, was for the Government to acquire a government use license for use, in United States Government contracts, of the P-3 Data contained in Lockheed Martin's Stress Memorandum Manual and Design Handbook, and other documents containing portions thereof, that bore Lockheed Martin's restrictive legend. Consequently, the P-7 Settlement License provided that the United States Government:

shall have *"Greater Rights"* in the form of a perpetual, paid-up, nonexclusive, irrevocable and royalty free license to duplicate, disclose, use or have used *on behalf of the government*, including for purposes of competitive or sole source procurements, in the P-3 Data in the Government's Possession with a Restrictive Rights Legend, including but not limited to, all P-3 Data. . .

P-7 Settlement License, Section III (emphasis added).

31.  Consistent with the agreement between Lockheed Martin and the Navy, the U.S. Government expressly agreed that:

*Greater Rights Data shall not be used for* the following:

(a)  the manufacture of new or derivative Electra or P-3 aircraft;

(b)  an aircraft modification, alteration, redesign, or remanufacture which replaces or significantly alters seventy percent (70%) or more of the weight of an existing aircraft's airframe under one program; or

(c)  *the repair, maintenance, overhaul, modification, or service life extension*, or the acquisition or manufacture of spare parts, or any other aircraft modification, alteration, redesign, or remanufacture, *for any non-United States government owned and operated aircraft*, including but not limited to FMS contracts.

P-7 Settlement License, Section III.3 (emphasis added).

32.  The P-7 Settlement License further required the U.S. Government not to disclose Greater Rights Data to third parties without first executing a Nondisclosure Agreement that (1) specifically referenced the P-7 Settlement License and (2) required the third party's compliance with the terms thereof. *See* Exhibit to P-7 Settlement License (Nondisclosure Agreement). Moreover, the form of Nondisclosure Agreement agreed to by Lockheed Martin and the U.S. Government specifically requires the signatory to comply with the terms of the P-7

Settlement License and thereby binds the recipient of "Greater Rights Data" to the restrictions on further use contained in the P-7 Settlement License.

33. From the time of its execution in 1993 through the present, the P-7 Settlement License has served as the only source of permission for the U.S. Government to use Lockheed Martin Electra and P-3 proprietary data. Accordingly, the rights of any third party to whom the Government has disclosed such "Greater Rights Data" must be determined under the provisions of the P-7 Settlement License.

34. On information and belief, L-3 Comm and its predecessors (E-Systems and Raytheon E-Systems) have performed P-3 aircraft work under a contract or contracts with the U.S. Navy that would have permitted the Navy to provide L-3 Comm with P-3 Data, but only subject to the terms and conditions of the P-7 Settlement License.  Under the terms of the P-7 Settlement License, L-3 Comm was required to execute the form of Nondisclosure Agreement referenced above and otherwise to comply with all of the terms of the P-7 Settlement License.

### The "Avionics and Mission Systems License" Granted by Lockheed Martin to L-3 Comm

35. Prior to 1997, Lockheed Martin contracted with the Royal Australian Air Force ("RAAF") to perform modifications and upgrades to P-3 aircraft owned and

operated by the RAAF. L-3 Comm (then Raytheon E-Systems) was a subcontractor to Lockheed Martin under this contract.

36. As part of the settlement of a prime contractor/subcontractor dispute between Lockheed Martin and L-3 Comm, Lockheed Martin granted L-3 Comm a limited license in certain P-3 Data. This "Avionics and Mission Systems License" granted L-3 Comm rights in P-3 Data necessary to perform work only on specified avionics and mission systems, and only with respect to work to be performed by L-3 Comm.

37. The Avionics and Mission Systems License, which is attached hereto as Exhibit B and incorporated herein by reference, was executed on August 28, 1997, and provided, in relevant part:

2.  **GRANT OF RIGHTS:**

2.1  Subject to the terms and conditions of this Agreement, [Lockheed Martin] hereby grants to [L-3 Comm] a non-exclusive, royalty-free, license to use, in confidence, LICENSED DATA *for the sole purpose of offering and selling to any third party only* modifications or upgrades of flight avionics and ASW/ASUW mission systems similar to systems which are the subject of RAAF Project Air 5276 and related support for P-3 Aircraft (all models) including the following mission systems functions:

| | | |
|---|---|---|
| Radar | Navigation | Stores Management |
| ESM | Flight Avionics | Weapons and Ordnance |
| Acoustic | Data Management | EO/IRDS |

| | | |
|---|---|---|
| Comms | Self Protect | Defensive Aids |
| Cameras | MAD | Data Link |

*And for no other purposes.*

2.2   The license grant of 2.1, shall extend for a period of twenty (20) years from the date of execution by the second party hereto, provided, however, [L-3 Comm] shall be authorized to use LICENSED DATA to provide all support required under any contract entered into by [L-3 Comm] during term of this Agreement. [L-3 Comm] shall be authorized to use, subject to all other terms of this Agreement, LICENSED DATA to perform any contract on which [L-3 Comm] bid, offered, or tendered during the twenty (20) year term of this Agreement even if award of a contract occurs after said twenty (20) year term.

2.3   *This license is not transferable by [L-3]* except with [Lockheed Martin's] advance written consent which shall not be unreasonably withheld, except that [L-3 Comm] shall have the right of transfer to a purchase or successor in interest to substantially all of [L-3's] assets. *[L-3] shall not have the right to grant any sublicenses hereunder.*

Avionics and Mission Systems License, Section 2, pp. 1-2 (emphasis added).

38. The Avionics and Mission Systems License permitted L-3 Comm to disclose P-3 Data to the United States and to foreign governments, but only to the extent necessary for L-3 Comm to pursue and perform contracts to upgrade the specific systems enumerated in the license, and then only with a restrictive marking precluding any other disclosure or use of the data by the third party

(unless such disclosure was made under the terms of a nondisclosure agreement in the form appended to the license).

39. The nondisclosure agreement required by the Avionics and Mission Systems License requires, *inter alia*, that the third party hold Lockheed Martin proprietary data in strict confidence, use the proprietary data only for the specific purposes permitted under the license, and return all licensed data within 30 days of completion of the work. The nondisclosure agreement further provides that "any violation of this Agreement shall constitute irreparable injury for which damages are an inadequate remedy."

## The Republic of Korea P-3 Upgrade Project

40. On information and belief, L-3 Comm has been working with KAI as a potential subcontractor to KAI under KAI's proposal to perform substantial systems upgrades and service life extension work on P-3 aircraft owned and operated by the ROK, as well as upgrades, modifications and additions to the P-3 avionics and mission systems. This program is referred to as the Korean LOT II Maritime Patrol Aircraft (MPA) program ("ROK P-3 Program"). Under the ROK P-3 Program, the ROK plans to buy eight excess P-3 aircraft from the United States that will be refurbished and equipped with various sorts of mission

equipment, including an Electro-Optical and Infra-Red system. The eight aircraft are valued at approximately $565 million.

41. In order to perform the work under this program in a commercially viable, timely, and safe manner, it will be necessary to perform certain structural work, and this structural work will require use of P-3 Data – data contained in Lockheed Martin's Stress Memorandum Manual and Design Handbook, as well in various engineering reports and other documents that contain portions of the Stress Memorandum Manual and Design Handbook. This work will also require the use of P-3 Data for avionics and mission systems.

42. Lockheed Martin had also submitted a proposal for the ROK P-3 Program and had planned to perform the contract, if selected, using Korean Air Lines ("KAL").

43. Lockheed Martin, consistent with its policy and practices of safeguarding its proprietary data, advised both the ROK and L-3 Comm in January, 2005, of Lockheed Martin's position that L-3 Comm did not have the necessary licenses or other proper rights to use P-3 Data to perform the ROK P-3 Program.

44. On information and belief, L-3 Comm has already engaged in the unlicensed use of P-3 Data contrary to the terms of the P-7 Settlement License and

the Avionics and Mission Systems License to prepare its proposal for the ROK P-3 Program and to conduct negotiations with KAI and the ROK.

## COUNT I – Misappropriation or Misuse of Trade Secrets

45. Lockheed Martin incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1-44 of this Complaint.

46. The P-3 Data constitutes trade secrets of Lockheed Martin. In particular, the P-3 Data consists of technical data that derives actual economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Furthermore, the P-3 Data is the subject of efforts that are reasonable under the circumstances to maintain the secrecy of the data.

47. L-3 well knows the commercial value of the proprietary P-3 Data.

48. Furthermore, Lockheed Martin has always protected the secrecy of the P-3 Data. As noted above, in the contracts governing the P-3 Data at issue, confidentiality restrictions have been put in place that carefully restrict the use of the data. And Lockheed Martin, as noted above, has always protected the data, by notifying any party suspected of misusing the data about Lockheed Martin's proprietary rights in the data.

49. Lockheed Martin believes that L-3 Comm has already misused the P-3 Data, to prepare its proposal for the ROK P-3 Program and to conduct negotiations with KAI and the ROK. Lockheed Martin further believes (and fears) that L-3 Comm further intends to disclose P-3 Data to KAI and the ROK.

50. Pursuant to the Georgia Trade Secrets Act, O.C.G.A. § 10-1-762, Lockheed Martin demands injunctive relief against L-3 Comm, to prevent actual or threatened misappropriation and misuse of Lockheed Martin's trade secrets.

51. To any extent damages can be measured in this case, Lockheed Martin seeks compensatory damages against L-3 Comm in an amount to be proved at trial. Lockheed Martin further seeks an award of attorneys' fees under O.C.G.A. § 10-1-764, as well as punitive damages, to address L-3 Comm's conduct.

**COUNT II – Breach of License Agreements and Nondisclosure Agreements**

52. Lockheed Martin incorporates by reference, as if fully set forth herein, the allegations contained in Paragraphs 1-51 of this Complaint.

53. L-3 Comm has breached the terms of the P-7 Settlement License and the nondisclosure agreement that the Navy was required to have L-3 Comm execute. As mentioned above, the nondisclosure agreement required L-3 Comm to comply with the terms of the P-7 Settlement License, which permitted use of P-3 Data only in the course of work under certain U.S. Government contracts, and expressly

prohibited use of "Greater Rights Data" on aircraft not owned and operated by the United States.

54. Furthermore, with respect to the nondisclosure agreement that the U.S. Government was required to have L-3 Comm execute to receive any P-3 Data, Lockheed Martin was clearly the third-party beneficiary of such nondisclosure agreement.

55. L-3 Comm has breached the terms of the Avionics and Mission Systems License by using and disclosing P-3 Data to KAI and the ROK for work that will not be performed by L-3 Comm, and by using and disclosing P-3 Data for work beyond the specific avionics and mission systems upgrade work permitted under the license.

56. L-3 Comm's unlawful release, use, and disclosure of the P-3 Data has and will irreparably harm Lockheed Martin's competitive interests in pursuing other work, including upgrade and modification of numerous P-3 aircraft owned and operated by other foreign governments.

57. For L-3 Comm's breaches of contract, Lockheed Martin seeks injunctive relief.

58. Lockheed Martin further seeks compensatory damages, in an amount to be proved at trial.

25

59. Finally, Lockheed Martin seeks the recovery of attorneys' fees, under O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

WHEREFORE, Lockheed Martin respectfully requests that this Court:

1.   Issue a Permanent Injunction perpetually enjoining and restraining L-3 Comm, its officers, agents, employees, successors, attorneys and other representatives, and all those in active concert or participation with L-3 Comm, from any use or disclosure of Lockheed Martin P-3 Data that is inconsistent with the terms of either the P-7 Settlement License or the Avionics and Mission Systems License, and which specifically enjoins and restrains L-3 Comm from any use or disclosure of: (a) structural data contained in Lockheed Martin's Stress Memorandum Manual and Design Handbook and portions thereof, including engineering reports and other documents marked with a Lockheed Martin commercial proprietary legend that contain portions of the Manual and Handbook, which constitute "Greater Rights Data" under the terms of the P-7 Settlement License and (b) P-3 Data to KAI or to the ROK except to the extent necessary for L-3 Comm (and no other party) to perform only the specified mission systems upgrade work expressly permitted under said license.

2.    In addition to the foregoing injunctive relief, award Lockheed Martin monetary damages in an amount to be adduced at trial for L-3 Comm's ongoing use and disclosure of unlicensed P-3 data; for punitive damages for L-3 Comm's violations of the Georgia Trade Secrets Act; and Lockheed Martin's attorneys' fees and costs.

3.    Such further relief as the Court may deem appropriate.

Respectfully submitted this _4_ <sup>th</sup> day of April, 2005 by:

*[signature: William H Boice]*

KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)

William H. Boice
Georgia Bar No. 065725
James F. Bogan III
Georgia Bar No. 065220
Audra A. Dial
Georgia Bar No. 220298
Counsel for Plaintiff Lockheed Martin Corporation

*Pro hac vice* applications to be submitted for:

Venable LLP
575 7th Street, NW
Washington, D.C. 20004
(202) 344-4803 (Telephone)
(202) 344-8300 (Facsimile)

Thomas J. Madden
Terry L. Elling

Counsel for Plaintiff Lockheed Martin Corporation

## CERTIFICATE OF COMPLIANCE

As required by Local Rule 7.1D, I hereby certify that this pleading has been prepared in Times New Roman 14-point font, one of the font and point selections approved by this Court in Local Rule 5.1B.

KILPATRICK STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
(404) 815-6500 (Telephone)
(404) 815-6555 (Facsimile)

William H. Boice
Georgia Bar No. 065725
James F. Bogan III
Georgia Bar No. 065220
Audra A. Dial
Georgia Bar No. 220298
Counsel for Plaintiff Lockheed Martin Corporation

EXHIBIT
A

ORDER FOR SUPPLIES OR SERVICES

Form Approved
0704-0187
Aug 31, 1992

| 1. CTR/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. CERTIFIED FOR NATIONAL DEFENSE UNDER DMS REG 1 |
|---|---|---|---|---|
| N19-92-G-0089 | 0007 | 9/29/93 | N00019-93-P2-KK265 | |

| | ISSD BY | CODE | N00019 | 7. ADMINISTERED BY (If other than 6) | CODE | S1111X | 6. DELIVERY FOB |
|---|---|---|---|---|---|---|---|

DEPARTMENT OF THE NAVY
Naval Air Systems Command
Washington, D.C.  20361
AIR-21522    P.SEVERINO
Telephone: Area Code 703,746-2806

SEE SECTION G.

DUPLICATE ORIGINAL

☐ DEST
☑ OTHER
(See Schedule if other)

| 9. CONTRACTOR | CODE | FACILITY CODE | 10. DELIVER TO FOB POINT BY (Date) | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|

Lockheed Corporation for its Division 98897
LOCKHEED AERONAUTICAL
SYSTEMS COMPANY
86 SOUTH COBB DRIVE
MARIETTA, GEORGIA  30063    Parent Co. TIN No.:
Parent Co.:

TIN No.: 95-0941880

☐ SMALL
☐ SMALL DISAD-VANTAGED
☐ WOMEN-OWNED

12. DISCOUNT TERMS

13. MAIL INVOICES TO

| 14. SHIP TO | CODE | 15. PAYMENT WILL BE MADE BY | CODE | N00179 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |
|---|---|---|---|---|---|

SEE SECTION G.

| 16. TYPE OF ORDER | | | |
|---|---|---|---|
| ☑ DELIVERY | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. | | |
| ☐ PURCHASE | Reference your                                          furnish the following on terms specified herein. | | |

ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH AND AGREES TO PERFORM THE SAME.

Lockheed Corporation for its Division
Lockheed Aeronautical Systems Company

| NAME OF CONTRACTOR | SIGNATURE | A. Goldfarb  Attorney-In-Fact | 23 Sept 1993 |
|---|---|---|---|
| | | TYPED NAME AND TITLE | DATE SIGNED |

* this box is marked, supplier must sign Acceptance and return the following number of copies:    (P7        ) (LAR)

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE

SEE APPROPRIATION DATA SHEET ATTACHED.

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICE | 20. QUANTITY ORDERED/ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | See attached pages. | | | | |

*If quantity accepted by the Government is same as quantity ordered, indicate by x. If different, enter actual quantity accepted below quantity ordered and encircle.

| 24. UNITED STATES OF AMERICA | DATE: 9/29/93 | 25. TOTAL | 54,000,000.00 |
|---|---|---|---|
| BY CONTRACTING/ORDERING OFFICER P.D.Severino | | 29. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | 27. SHIP. NO. | 28. D.O. VOUCHER | 30. |
|---|---|---|---|
| ☐ INSPECTED  ☐ RECEIVED  ☑ ACCEPTED AND CONFORMS TO THE CONTRACT | | | INITIALS |
| P.D.Severino | | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| DATE    SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | ☐ PARTIAL  ☐ FINAL | | |
| | 31. PAYMENT | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment. | ☐ COMPLETE | |
| DATE    SIGNATURE AND TITLE OF CERTIFYING OFFICER | ☐ PARTIAL  ☐ FINAL | 35. BILL OF LADING NO |

| RECEIVED AT | 38. RECEIVED BY | 39. DATE RECEIVED | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO |
|---|---|---|---|---|---|

COMPUTER GENERATED DD FORM 1155, SEP 89    Previous editions are obsolete.    CONTRACTOR MUST SUBMIT FOUR COPIES OF INVOICE

N00019-92-G-0089
Order 0007

This Order 0007 is issued in conjunction with modification
P00014 to Contract N00019-89-C-0097 (the P-7A contract), as
executed by Lockheed and the Navy. It is executed pursuant to the
authority noted in the Section H Clause entitled, "Orders --
(Fixed-Price) (FEB 1992) (NAVAIR 5252.216-9535) (PCO)" of Basic
Ordering Agreement (BOA) N00019-92-G-0089. All terms of said BOA
are applicable to this Order 0007.

## I. Definitions

In resolving their disagreements, the Navy and Lockheed hereby
agree that in addition to the words and/or terms used herein and
defined in DFARS 252.227-7013(a) (OCT 1988), the following
definitions shall apply:

1. "Greater Rights" shall mean, in addition to limited rights,
the grant by Lockheed to the Government as set forth in this
BOA Order.

2. "Licensed Data" or "Greater Rights Data" shall mean the
data to which the License applies as set forth in this BOA
Order.

3. "P-3 Data" or "Data Relating to P-3 Aircraft" is defined
as that data corresponding or relating to the Electra, P-3
and/or any existing derivative aircraft thereof. Such data
shall include, but shall not be limited to computer software,
technical data, drawings, processes and standards.

4. "P-3 Data in the Government's Possession" shall mean all
P-3 Data which is currently in the possession, custody or
control of the Government, which comes into the possession of
the Government by operation of Modification P00014 to the P-
7A contract, and/or which later comes into the possession of
the Government from Lockheed or any third party having the
rights to provide such P-3 Data to the Government, regardless
of whether or not the Government currently possesses rights
in such data.

5. "Restrictive Rights Legend" shall mean a limited rights,
restricted rights, or other marking authorized by a defense
procurement regulation, or a commercial legend with respect
to Lockheed's Stress Memorandum Manual or Design Handbook or
portions thereof, indicating Lockheed proprietary rights in
the marked document.

## II. STIPULATIONS

In consideration of the mutual covenants contained in this BOA

1

Order 0007 (BOA Order) the Navy and Lockheed hereby agree and stipulate to the following provisions:

1. Any P-3 Data in the Government's Possession which fails to include a Restrictive Rights Legend shall be deemed to be unlimited rights data.

2. Any P-3 Data in the Government's Possession which includes a Restrictive Rights Legend that has been crossed out by Lockheed, and which fails to include any additional legend expressly applicable to the United States Government, shall be deemed to be unlimited rights data.

3. To the extent provided herein, the provisions of this BOA Order take precedence over and supercede any limitations of any Restrictive Rights Legend(s) set forth on the P-3 Data.

4. Except to the extent that this BOA Order grants Greater Rights to the Government, this BOA Order shall have no impact, force or effect of law on the enforcement of any existing rights by either party in the P-3 Data. Nothing in this BOA Order shall restrict any Lockheed right to reproduce, use, license and disclose to others any P-3 Data.

.5. Lockheed shall provide Greater Rights in P-3 Data according to the terms and conditions contained herein, and warrants only its title to such P-3 Data, not its accuracy or sufficiency.

III. TERMS AND CONDITIONS

In consideration of the mutual covenants contained in this BOA the Navy and Lockheed hereby agree as follows:

1. Lockheed grants and confirms that the Government, in accordance with the limitations, terms and conditions set forth herein, shall have "Greater Rights" in the form of a perpetual, paid-up, non-exclusive, irrevocable and royalty free license to duplicate, disclose, use or have used on behalf of the Government, including for purposes of competitive or sole source procurements, in the P-3 Data in the Government's Possession with a Restrictive Rights Legend, including but not limited to, all P-3 Data included within "Listing 2" as identified by Lockheed in its February 11, 1993 letter to the Navy, and confirmed by Lockheed's July 20, 1993 letter to the Navy. Such data shall include, but is not limited to, the Electra and P-3 800,000 and 900,000 series drawings.

2. Subject to the restrictions in paragraph III.3. below, the Government's use of the Licensed Data which is supplied with Greater Rights shall include, but is not limited to:

(a) the acquisition and/or manufacture of spare parts for

2

aircraft;

(b) the P-3 Sustained Readiness Program (SRP) and/or any other life extension program on existing aircraft, including the replacement of portions of the aircraft such as the wing, the tail and/or the engines;

aircraft maintenance and repair;

any SDLM or SLEP program; and/or

(e) any other aircraft modification, alteration redesign, or remanufacture program.

3. As to those rights that the Government currently has in the P-3 Data which pre-exist the execution date of this BOA Order, the prohibitions listed below do not apply. As to the Greater Rights in P-3 Data that are conveyed or conferred by Lockheed to the Government under this BOA Order, the following enumerated and exclusive prohibitions apply and the Navy agrees that such Greater Rights Data shall not be used for the following:

(a) the manufacture of new or derivative Electra or P-3 aircraft;

(b) an aircraft modification, alteration, redesign or remanufacture which replaces or significantly alters seventy percent (70%) or more of the weight of an existing aircraft's airframe under one program; or

(c) the repair, maintenance, overhaul, modification, or service life extension, or the acquisition or manufacture of spare parts, or any other aircraft modification, alteration, redesign, or remanufacture, for any non-United States government owned and operated aircraft, including but not limited to FMS contracts.

4. In addition, the Government shall not disclose or make available the data which is to be supplied with Greater Rights to any third party without the third party first executing a Nondisclosure Agreement, substantially similar to that attached as "Exhibit A." Once a third party receiving Greater Rights Data has executed this nondisclosure agreement, Lockheed shall have no claim or cause of action against the Government for damages related to the third party's misuse or unauthorized disclosure of this data. The Navy shall provide a copy of this BOA Order to all such third parties.

5. This BOA Order 0007 shall supplement and does not reduce any rights in P-3 Data, including but not limited to limited rights in data, which the Government has at the time of its execution. Effective upon execution of this order Lockheed hereby grants the

3

Government Greater Rights in P-3 Data as defined herein

6.   Nothing in this BOA Order shall obligate Lockheed to deliver P-3 Data which is not P-3 Data in the Government's Possession as defined herein.

7.   Lockheed releases the Government and waives the right to bring any cause of action against the Government or its employees, or any third party, for any unauthorized use and/or disclosure by the Government of any and all Lockheed alleged proprietary data relating to the Electra and/or P-3 aircraft to any and all third parties, which may have occurred at any time prior to the execution of this BOA Order.

7.   Failure by either party to enforce any of the provisions of this BOA Order shall not be construed as a waiver by such party of any such provisions, nor in any way affect the validity of this BOA Order 0007 or any part thereof.

IV.  ACCORDINGLY, the following Order is hereby issued under this BOA.

1. Under SECTION B, "SUPPLIES OR SERVICES AND PRICES":

| Item | Supplies or Services | QTY | Price |
|------|---------------------|-----|-------|
| 0337AA | Greater Rights in P-3 Data ACRN: | XXX | $4,000,000.00 |

2.   Under SECTION C, "DESCRIPTION OR SPECIFICATIONS OR WORK STATEMENT":

Item 0337AA - Item 0337AA shall be provided as described in this BOA Order 0007.

3.   Under SECTION F, "DELIVERIES OR PERFORMANCE":

The Greater Rights for the Navy's use of P-3 Data are deemed to have been delivered and accepted as evidenced by execution of this BOA Order 0007 and in accordance with Section III, "Terms and Conditions" paragraph 5.

4

**EXHIBIT**

Third party (Licensee) acknowledges receipt of technical data, computer software and/or CADCAM materials and agrees to preserve and protect such technical data, computer software and/or CADCAM materials from disclosure to any person or persons, other than its employees with a need to know, through an exercise of care equivalent to the degree of care it uses to preserve and protect its own proprietary information and in any event no less than a reasonable standard of care for protection.

2.    Third party (Licensee) agrees that any technical data, computer software and/or CADCAM materials disclosed hereunder shall be used only by third party (Licensee) for the purposes set forth in Contract No.

3.    Third party (Licensee) acknowledges receipt of BOA Order 0007, including paragraph II.5., and agrees to comply with the terms of the Order governing the use, duplication and disclosure of technical data, computer software and/or CADCAM materials as provided or made available to it by the Navy.

EXHIBIT
B

08/27/97   WED 14:53 FAX 903 45_ __`59       RAYTHEON E-SYS LEGAL 

A-02-304

# LICENSE AGREEMENT

THIS AGREEMENT is made and entered into as of the 1st day of September, 1997, by and between LOCKHEED MARTIN CORPORATION, by and through its division, Lockheed Martin Aeronautical Systems, having offices at U. S. A., (hereinafter referred to as "LICENSOR"), and RAYTHEON E-SYSTEMS, INC., having offices at Majors Field, FM 1570, Greenville, Texas 75402, U. S. A., (hereinafter referred to as "LICENSEE").

## WITNESSETH:

WHEREAS, LICENSOR has developed and is the owner of certain design and manufacturing information and drawings containing Trade Secrets and Know-How of LICENSOR which relate to the P-3 Aircraft (hereinafter called "TECHNICAL DATA"), and has the right to license said TECHNICAL DATA to others; and

WHEREAS, as a condition to a SETTLEMENT AGREEMENT entered into between LICENSEE and Lockheed Martin Tactical Systems, Inc., a unit of LICENSOR, LICENSOR is required to grant LICENSEE a license in accordance with the terms of said SETTLEMENT AGREEMENT;

WHEREAS, LICENSOR is desirous of licensing said TECHNICAL DATA to LICENSEE and LICENSEE is desirous of receiving said TECHNICAL DATA in accordance with the terms of the SETTLEMENT AGREEMENT and for no other purpose.

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions hereafter set forth and for other good and valuable considerations hereby acknowledged, the parties hereto agree as follows:

1.   DEFINITIONS:
1.1   LICENSED DATA is all data, know-how, and trade secrets covered by P-3 Aircraft License Agreement (A-02-274) dated February 18, 1995 between Lockheed Martin and the Commonwealth of Australia and the Proprietary Information/Non-Disclosure Agreement of Exhibit 2 thereof and other Lockheed Martin data peculiar to the P-3 Aircraft which are subject to restrictions, that are lawfully in LICENSEE's possession or are later lawfully obtained from LICENSEE's customers (LICENSED DATA).

2.   GRANT OF RIGHTS:
2.1   Subject to the terms and conditions of this Agreement, LICENSOR hereby grants to the LICENSEE a non-exclusive, royalty-free, license to use, in confidence, LICENSED DATA for the sole purpose of offering and selling to any third party only modifications or upgrades of flight avionics and ASW/ASUW mission systems similar to systems which are the subject of RAAF Project Air 5276 and related support for P-3 Aircraft (all models) including the following mission systems functions:

08/27/97   WED 14:53 FAX 903 45__ __59       RAYTHEON E-SYS LEGAL

| | | |
|---|---|---|
| Radar | Navigation | Stores Management |
| ESM | Flight Avionics | Weapons and Ordnance |
| Acoustic | Data Management | EO/IRDS |
| Comms | Self Protect | Defensive Aids |
| Cameras | MAD | Data Link |

and for no other purposes.

2.2    The license grant of 2.1, shall extend for a period of twenty (20) years from the date of execution by the second party hereto, provided, however, LICENSEE shall be authorized to use LICENSED DATA to provide all support required under any contract entered into by LICENSEE during the term of this Agreement.  LICENSEE shall be authorized to use, subject to all other terms of this Agreement, LICENSED DATA to perform any contract on which LICENSEE bid, offered or tendered during the twenty (20) year term of this Agreement even if award of a contract occurs after said twenty (20) year term.

2.3    This license is not transferable by LICENSEE except with LICENSOR's advance written consent which shall not be unreasonably withheld, except that LICENSEE shall have the right of transfer to a purchaser or successor in interest to substantially all of LICENSEE's assets.  LICENSEE shall have no right to grant any sublicenses hereunder.

3.    **MAINTENANCE OF RECORDS:**
    LICENSEE agrees to keep full, accurate, and complete records respecting use of the LICENSED DATA under this Agreement.  LICENSEE further agrees to make such records reasonably available to LICENSOR within 30 days of a written request, and LICENSOR shall have the right to examine such records during reasonable business hours for the purpose of determining LICENSEE's compliance with the terms of this Agreement.

4.    **CONFIDENTIALITY:**
4.1    LICENSEE shall maintain all LICENSED DATA in strict confidence.  However, LICENSEE shall have the right to disclose to third parties solely in furtherance of the purposes of this Agreement under the terms of a confidentiality agreement restricting unauthorized use and disclosure no less restrictive than that contained in Attachment A hereto.

4.2    LICENSEE shall have the right to disclose LICENSED DATA to the United States Government or a Foreign Government solely in the furtherance of the purposes of this Agreement, including, but not limited to, pursuit of programs, contracts and similar business, provided such disclosures include appropriate restrictive legends against further disclosure to or use by third parties (unless such further disclosure is under the terms of a confidentiality agreement restricting unauthorized use and disclosure no less restrictive than that contained in Attachment A hereto.)



5.    **DISCLAIMER:**
5.1    LICENSOR MAKES NO OTHER WARRANTIES OR REPRESENTATION OF ANY KIND, EXPRESS OR IMPLIED WITH RESPECT TO THE CONTENT, ACCURACY, SUFFICIENCY OR ADEQUACY OF THE LICENSED DATA, INCLUDING THE FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY OR NON-INFRINGEMENT, AND LICENSOR ASSUMES NO RESPONSIBILITY OR OBLIGATION IN THESE REGARDS.

6.    **HOLD HARMLESS AND INDEMNITY:**
6.1    LICENSEE EXPRESSLY AGREES THAT THE LICENSED DATA WHICH HAVE BEEN PROVIDED TO LICENSEE HERETOFORE OR WHICH IS LATER ACQUIRED HEREUNDER WILL BE ACCEPTED ON AN "AS IS" BASIS.  UNDER NO CIRCUMSTANCES SHALL LICENSOR BE LIABLE FOR ANY DIRECT, OR INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES TO LICENSEE, THEIR VENDORS AND CUSTOMERS FROM USE OF OR DEFECTS IN LICENSED DATA AND LICENSEE SHALL INDEMNIFY AND HOLD LICENSOR HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS OR REMEDIES, SUITS, ACTIONS, LIABILITIES AND DAMAGES, WHETHER IN TORT, AND WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF LICENSOR IN CONTRACT OR OTHERWISE, INCLUDING COSTS, EXPENSES AND ATTORNEY'S FEES INCIDENT THERETO, WHICH MAY BE SUFFERED BY, ACCRUED AGAINST, CHARGED TO OR RECOVERABLE FROM LICENSOR BY REASON OF INJURY TO OR DEATH OF ANY PERSON OR BY REASON OF LOSS OF OR DAMAGE TO PROPERTY (TANGIBLE AND INTANGIBLE) ARISING FROM LICENSEE'S USE OF THE LICENSED DATA.

7.    **CONSTRUCTION AND UNDERSTANDING:**
7.1    This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware, U. S. A.  This written instrument constitutes the entire agreement between the parties and shall not be varied, amended, or supplemented except by a writing of subsequent or even date executed by both parties.

7.2    Failure by either party at any time to enforce any of the provisions of this Agreement shall not be construed as a waiver by such party of any such provisions, nor in any way affect the validity of this Agreement or any part thereof.

8.    **PUBLICITY:**
    LICENSEE agrees to obtain LICENSOR's approval before publishing or distributing any sales brochures, pamphlets, or other advertising or promotional material when reference is made therein to LICENSOR or its wholly-owned subsidiaries or to the name "Lockheed Martin", LICENSOR agrees to promptly advise LICENSEE of any objections it may have to such references provided, however, LICENSEE may publish information disclosing the existence of this license and LICENSEE's right to use licensed technical data.



### 9.    AUTHORIZATIONS:

9.1    It is understood and agreed by LICENSEE that this Agreement is permanently subject to the rules prevailing in both the U. S. A. and foreign countries disciplining transfer of technology and supplies in the armament field and relevant authorizations from the cognizant Government Authorities, including but not limited to export licenses to be issued by the respective authorities of such Governments.

9.2    LICENSEE shall be solely responsible to file any application to such Government Authorities to obtain any such Authorization.

### 10.    OTHER DATA:

Nothing herein shall limit or diminish, either expressly or by implication, any rights either party may have to any data, drawings, plans, specifications or other information which is in or which may come into the public domain without breach of this Agreement, is lawfully received from a third party without restriction or is independently developed by the party without breach of this Agreement.

### 11.    AGREEMENT IDENTIFICATION:

For document identification and reference purposes, this Agreement shall be Agreement A-02-304.

### 12.    BINDING AGREEMENT:

Subject to the limitations set forth in Article 1 hereof, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

IN WITNESS WHEREOF, the parties hereto have caused this AGREEMENT to be executed effective as of the day and year above provided.

LOCKHEED MARTIN CORPORATION
AERONAUTICAL SYSTEMS

By: _____

Name typed   Alfred G. Hansen

Executive Vice President
Program Operations
Aug. 28, 1997

RAYTHEON E-SYSTEMS, INC.

By: _____

Name typed:   Alan Doshier

Title:   Vice President and
General Manager

Date:   27 August 1997

Settlement Agreement and Grant of License

This Settlement Agreement and Grant of License by and between Lockheed Martin Tactical Systems, Inc. (LMTS) and Raytheon E-Systems, Inc. (RESY) sets forth certain understandings between the parties relating to an agreed upon framework to resolve disagreements that have arisen relating to Project Air 5276 P-3C Refurbishment Project Subcontract 62505C00003 between RESY and LMTS ( hereinafter Subcontract).

To obtain resolution of all of the issues that are now in arbitration between LMTS and RESY in connection with the Subcontract, the parties have agreed as follows:

1. Lockheed Martin Corporation (Lockheed Martin) and the Commonwealth of Australia have entered into a P3 Aircraft Data Agreement (A-02-374) and the Proprietary Information Non-Disclosure Agreement of Exhibit 2 thereto. On or before August 31, 1997 LMTS will secure for RESY license rights to data covered by the P-3 Aircraft Data Agreement (A-02-374) and to the Proprietary Information/Non-Disclosure Agreement of Exhibit 2 thereto and to other similar Lockheed Martin data peculiar to P-3 data, which is subject to restrictions, that is lawfully in RESY's possession or later lawfully obtained from Customer (hereinafter "Licensed Data") as follows:

   Lockheed Martin will grant RESY a worldwide, royalty-free 20 year license to use, in confidence, Licensed Data peculiar to the P-3 Aircraft for the sole purpose of offering and selling only modifications or upgrades of flight avionics and ASW/ASUW mission systems similar to RAAF Project Air 5276 and related support for P-3 Aircraft (all models), including the following mission systems functions:

   | Radar | Navigation | Stores Management |
   |---|---|---|
   | ESM | Flight Avionics | Weapons and Ordnance |
   | Acoustic | Data Management | EO/FDS |
   | Comms | Self Protect | Defensive Aids |
   | Cameras | MAD | Data Link |

   RESY will indemnify and hold harmless Lockheed Martin for the use of the Licensed Data. Nothing contained in this agreement shall change or be construed to alter Lockheed Martin's rights in the Data Management Systems (DMS) as provided for in the Subcontract.

2. Upon the exchange of appropriate releases, RESY will pay LMTS $20,900,000 US, less $11,196,592 already paid through supplemental agreements 5, 6, 7 and 10 under the Subcontract. The total payment shall be $9,703,408 on August 4, 1997. The parties agree that this Settlement Agreement and Grant of License increases the Subcontract price by $20,900,000. This amount incorporates the above-mentioned supplemental agreement and increases the Subcontract price by $7,196,592. Therefore, the next supplemental agreement to the Subcontract will increase the Subcontract price by $13,703,408. The Supplemental Agreement in paragraph 6 below shall reflect a line item for the Settlement and Grant of License with a milestone payment amount of $20,900,000, per the above description.

3. RESY shall have the sole responsibility to apply for and to secure, at its expense, any necessary United States government export control licenses, agreements or releases.



4. The following documents shall form the basis to define the baseline:

| Description | Document No | Rev | Date Issued |
|---|---|---|---|
| Interface Requirement Specifications | F6260.00.64 | B | 29 Jan 97 |
| Data Management Subsystem Specification | F6260.00.71 | C | 20 May 97 |
| Data Operator to Software Interface IRS | F6260.00.74 | C | 20 May 97 |
| Navigation/Radar IRS | F6260.00.78 | E | 22 Jan 97 |
| Data Management/Navigation IRS | F6260.00.79 | E | 20 May 97 |
| Acoustic System/Mission Subsystems IRS | F6250.00.50 | C | 5 Feb 97 |
| Interface Specification for DMS/Radar | F6260.00.82 | C | 22 Jan 97 |
| MSU IRS | F6230.00.109 | F | 20 May 97 |
| MSU DRS | F6230.00.151 | C | 20 May 97 |
| Mission Equipment Bus Protocol Specification | F6190.00.131 | D | 20 Mar 97 |
| Interface Control Document (ICD) for AN/ASQ-504 (V) | TD3707 | B | 6 Jan 97 |
| Statement of Work | F6230.00.15 | B | |

as modified by LMS letter DMS 0718, and LMS letter DMS 0719, except DMS 0719's paragraph concerning changing the number of Engineers and the paragraph concerning Firmware.

LMS and RESY agree to the following Software delivery schedule:

- Delivery of Software Increment 1 ................................. 30 October 1997
- Delivery of Software Increment 2 ................................. 30 January 1998
- Delivery of Fully Tested Software, except Mad and OMS Funcs ..... 4 April 1998
- Delivery of Fully Tested Software ............................... 10 June 1998

LMS and RESY acknowledge that the above schedules are at risk by up to 4 weeks and that failure to meet the schedule shall not be considered to be a fault of either party. Such schedule slip shall be at no additional increase to the price of the subcontract.

LMS and RESY agree to the following Hardware delivery schedule:

| Description | Delivery date |
|---|---|
| SFL | 29 Aug 97 |
| OMS | 30 Sep 97 |
| Aircraft No. 1 | 30 Nov 97 |
| Aircraft No. 2 | 30 Jan 98 |
| Aircraft No. 3 | 30 Jan 98 |
| Aircraft No. 4 | 10 Feb 98 |
| Aircraft No. 5 | 25 Feb 98 |
| Aircraft No. 6 | 3 Mar 98 |
| Aircraft No. 7 | 24 Apr 98 |
| Aircraft No. 8 | 14 Jun 98 |
| Aircraft No. 9 | 6 Aug 98 |
| Aircraft No. 10 | 8 Oct 98 |
| Aircraft No. 11 | 1 Dec 98 |
| Aircraft No. 12 | 29 Jan 99 |
| Aircraft No. 13 | 15 Mar 99 |
| Aircraft No. 14 | 3 May 99 |
| Aircraft No. 15 | 26 Jun 99 |
| Aircraft No. 16 | 23 Aug 99 |
| Aircraft No. 17 | 23 Oct 99 |
| Aircraft No. 18 | 29 Dec 99 |



5a. This Settlement Agreement and Grant of License is subject to:

(a) Raytheon Chairman's approval on or before August 1, 1997.

(b) The right of either party to license the existence in the Subcontract-related arbitration proceedings between the Companies to release this decision at any time on or before August 1, 1997. Such an instruction must be in writing with a copy contemporaneously provided to the other party.

Failure to obtain the Chairman's approval under (a) above or release of the decision under (b) above shall make this Settlement Agreement and Grant of License null and void.

6. The parties shall in good faith negotiate a Supplemental Agreement to the Subcontract incorporating this agreement as required and such other matters as the parties may agree, including a complete schedule and current agreed to list of Semiconductors.

If the parties are unable to agree upon all terms and execute the Licenses set forth in paragraph 1 of this Settlement Agreement and Grant of License by August 11, 1997, or such execution thereof as the parties may agree, all monies paid hereunder shall be returned to RESY and the parties shall request in writing that the arbitrator in the Subcontract-related arbitration proceedings between the Companies release his decision, which decision shall become binding. Upon release of the arbitrator's decision this Settlement Agreement and Grant of License, except for this paragraph 7 which shall survive, shall become null and void and without further effect.

Nothing herein shall limit or diminish either expressly or by implication, any rights either party may have to any firm, drawings, plans, specifications or other information which is the or which may come into the public domain without breach of this agreement, is lawfully received from a third party without restriction or is independently developed by its party without breach of this agreement.

IN WITNESS WHEREOF, the parties have caused these presents to be executed by their duly authorized representatives as of the 21st day of July, 1997.

ACCEPTED ON BEHALF OF LOCKHEED
MARTIN TACTICAL SYSTEMS, INC.

By: _____
Title: President Defense Systems Eagan

ACCEPTED ON BEHALF OF
RAYTHEON E-SYSTEMS, INC.

By: _____
Title: VP of Ed Greenville Division